**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Demetrius Gatlin as Trustee for the Estate of Juwan Gatlin,**

**Plaintiff,**

v.

**Sergeant Michael Green, individually and in his official capacity as a Minneapolis Police Officer and the City of Minneapolis, a municipal corporation**

**Defendants.**

**Civil No. 01-154 JMR/SRN**

**ORDER**

---

Larry Burton Leventhal, on behalf of Plaintiff.

James Anthony Moore, on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on April 4, 2002, on Plaintiffs' Motion to Amend Complaint to Include Claim for Punitive Damages (Doc. No. 12).

This Order addresses that motion.

## I. PLAINTIFFS' MOTION TO AMEND COMPLAINT TO ALLEGE PUNITIVE DAMAGES.

### A. <u>Factual Background</u>

On June 22, 1997, Juwan Gatlin was interviewed at the Hennepin County Jail by Minneapolis Police Sergeants Michael Carlson and Michael Green. (Attachment 1; June 22,

JUL 0 1 2002
FILED ____________
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ________
DEPUTY CLERK ________

1997 Interview with Juwan Gatlin (Gatlin Interview).) At that time, the officers were investigating the murder of Anthony Dawson. Id. During the interview, Gatlin informed Carlson and Green that an individual named Mitchell Douglas was involved in the killing. Id. Gatlin also implicated another individual named Arthur Hurd. (Attachment 2; (August 8, 1998 Carlson Investigation Report (Investigation Report) at 1.) Gatlin explained that he was a member of the Mickey Cobra gang, as were Douglas and Hurd. (Gatlin Interview.) He stated that he knew where the gun and clothing were that had been used during the Dawson murder. Id. Gatlin explained that two days before he and Douglas were arrested for robbery, Douglas had talked to him about the killing. Id. Gatlin stated that since that time, he had been calling the homicide unit and talking with them. Id.

Gatlin also discussed other killings that had been committed by the Mickey Cobras, and supplied details of the gang's structure. Id. In return for his information and his consent to testify in court, Gatlin stated that he wished for help with the robbery charges he was then facing, the chance to relocate himself and his family out of state, and the chance to withdraw from his gang lifestyle, including removing his gang tattoos. Id. Gatlin's information led to the release of several people who had previously been arrested for the Dawson murder, and ultimately led to other people's arrest and conviction. (Carlson Depo. at 14.)

Minneapolis Police Sergeant Mark Lenzen and Carlson explained in their report that Gatlin would speak with them many times, and that,

> Gatlin clearly had a wealth of information regarding murders that have occurred in and around Minneapolis, however investigators were in the process of building a rapport with him in order to give him enough trust in us, to tell us everything he knew. Investigators were confident this would have eventually taken place, if he had not been murdered

(Investigation Report at 1.)

On June 20, 1998, Carver County Detention Deputy Eric Kittleson was performing his duty of reviewing outgoing mail from the jail. (Attachment 3; Deposition of Eric Kittleson (Kittleson Depo.) at 5.) Kittleson opened an envelope from Hurd, who was then an inmate, to another Mickey Cobra member, Andrew Neal. Id. The letter contained a copy of the transcript of Gatlin's interview with Green and Carlson, and was closed with the statement, "check this out, something needs to be done about this." Id. at 7. Kittleson was concerned that "the intent of the sender was for the receiver to take action on the information." Id. at 9. He also explained that he "believed the information in this transcript to be sensitive information in the hands of a third party being sent to another outside party possibly for retribution." (Attachment 10; 7/15/99 Informational Report (Informational Report).) Because of his concerns, Kittleson removed the letter from the mail. Id. Kittleson showed the letter to his supervisor, Sergeant Reed Ashpole. (Attachment 4; 7/19/99 Incident Report (Incident Report).) Ashpole had the similar concern that "by sending the letter it might lead to gang retribution." Id.

Ashpole called Green and informed him of the details of the letter. (Informational Report.) Ashpole asked Green if he wanted to subpoena the letter, which he described as a common process because it "gives the requesting department a clear chain of evidence if the information is to be used in a jury trial." Id. Green stated that he would get back in touch with Ashpole if he wanted to subpoena the information. Id. Two days later, Ashpole contacted Green a second time and asked him if he wanted to subpoena the letter. (Ashpole Depo. at 10-11[1].) In

[1]This citation is actually to evidence provided by Defendant. The Court is aware that, at this stage of the proceedings, it is not to consider evidence submitted in opposition to Plaintiff's

response, Green informed Ashpole that the department did not want to subpoena the information, and the letter could be placed in the mail. Id.

Green stated in his deposition that he understood the letter's purpose was "to let people know that Juwan Gatlin has been informing on the gang." (Attachment 8; Deposition of Michael Green (Green Depo.) at 33.) Green stated that during his second conversation with Ashpole,

> I told him that I had talked to the county attorney who had the Dawson case and received no definitive answer as to what to do with that piece of mail and that if it was against the policies and guidelines of the Carver County Sheriff's Department as set up by their sheriff, to not send it; but if it didn't fit the criteria for things that couldn't be sent, I didn't know how it could be stop [sic].

Id.

In a July 9, 1998 case supplement, Green explained the events as follows:

> Sgt. Ashpole advised me that the statement was going to be sent to an Andrew Neal at 1040 Irving Avenue North, Minneapolis. At the time I spoke with Sgt. Ashpole I was unaware of anything prohibiting the sending of this mail. In a conversation with Gary McGlennen, Assistant County Attorney, and later followup to this information I learned that the sending of this mail would be detrimental to the safety of Juwan Gatlin.

(Attachment 11; 7/9/98 Case Supplement of Sgt. Green (Case Supplement).)

McGlennen stated that he did not immediately receive Green's message. (Affidavit of Larry B. Leventhal (Leventhal Aff.) at ¶ 3.) McGlennen stated that when he did contact Green, Green informed him that he believed the letter had been placed into the mail. Id. In response, McGlennen stated that he instructed Green to stop the letter from going out if it was still

---

motion. The Court is only using this and any other such citations to fill in certain information which is missing as a result of omitted pages of deposition transcripts from Plaintiff's counsel's affidavit.

retrievable. Id. He was advised, however, that it had already been placed in the outgoing mail and had left the facility. Id.

Carlson described the series of events that took place after he learned the letter had been sent out as follows:

> When I had heard that, I kind of figured out what information there was. I paged Juwan. I didn't get a call back. Paged him again. Didn't get a call back. So Sergeant Lenzen and I went up to 1040 Irving Avenue North and knocked on the door. My intent was to talk to Andrew Neal about what was sent to his home, but we got no answer. Went back, you know – who knows what else we were doing at the time, working on another case perhaps. But I remember eventually later that day, Juwan called me regarding the earlier pages. And I explained that [to] him. He said, "No, no, no, don't do that. Don't go up there." I said, "what do you mean? And he said, "Don't. I already know about it. I already talked to Andrew about it. We grew up together. We go way back. Don't go up there." "Explain this to me, Juwan, Why?" His reasoning was, These people know me. This is a little shorty. That meaning Arthur Hurd and by shorty, I mean he has no status in the gang. He's just a young kid. And Bone – that was Andrew Neal's street name was Bone – Juwan said "Bone told me he's not going to put it out. Just stay away. Don't do this, I have it."

(Attachment 14; Deposition of Michael Carlson at 31.)

On July 9, 1998[2], Green had Ashpole paged at home. (Ashpole Depo. at 14.) Ashpole was asked to come in to the station and prepare a report on the letter. Id. Ashpole prepared the report, though he later stated "I thought it was unusual since when we had the Hurd letter that he did not want to subpoena it at that time." (Informational Report.)

On July 9, 1998, Gatlin appeared before the Honorable Alan Oleisky, District Judge for

---

[2]There is some confusion in the record as to whether this date was July 8 or July 9, 1998. Ashpole's Informational Report records the date as July 8, but in his deposition he states this occurred on July 9.

the Hennepin County District Court, for a hearing at which he would be released with no charges but probation for the robbery, and to be transferred out of state. (Green Depo. at 9.) After the hearing, Green spoke with Gatlin in the homicide office of City Hall, and informed him that the information he had provided "was out," and consequently, his life was in danger and he should leave Minneapolis. Id. at 10. Although Green had previously instructed Ashpole to send the letter out, he explained the events of July 9, 1998, by stating, "at that point we had the information that the statement he had given to us was out." Id.

Neal would later confirm that he had received the Gatlin interview transcript Hurd had sent from the jail, and given it to a fellow Mickey Cobra member named Donald Carter. (Investigation Report at 2.) April Bell, who was affiliated with the Mickey Cobras, stated that on the day Gatlin was killed, she heard Darrell Dante McKee and other Mickey Cobra members stating that they were going to kill Gatlin because he had been "snitchin." (Attachment 13; 8/19/98 April Bell Statement.) After the discussion, McKee retrieved some guns from a closet and left the house. Id. Two to five minutes later, McKee returned to the house with Mickey Cobra members Keith Henderson and Donte Evans. Id. McKee gave Bell some papers and asked her to put them in his bag, which was in her room. Id. Bell looked at the papers and found they contained "a statement of Juwan Gatlin, telling on everybody or who ever." Id.

### B. Pleading Requirements

"In the Federal Courts of this District, the pleading of a punitive damage claim, under causes of action premised upon the Laws of the State of Minnesota, must generally conform to the requisites of Minnesota Statutes Sections 549.191 and 549.20." Ulrich v. City of Crosby, 848 F. Supp. 861, 866 (D. Minn. 1994).

"As recognized by our Court, the Minnesota Legislature adopted, in 1986, the pleading requirements of Section 549.191 in order to deter certain practices in the presentment of punitive damage claims which were thought to be abusive, and in order to deter a perceived insurance crisis." Ulrich, 848 F. Supp. at 866-67. In all instances in which Minn. Stat. § 549.191 applies, a plaintiff may not assert a punitive damage claim in the complaint in the first instance, but rather must seek leave of court to amend the pleading pursuant to that section.

Under Minn. Stat. § 549.191, a motion for leave to amend a complaint to add a claim for punitive damages must set forth prima facie evidence in support of the motion, must allege the "applicable legal basis under section 549.20 or other law for awarding punitive damages in the action," and must be supported by one or more affidavits showing the factual basis for the claim. The "applicable legal basis" reads as follows: "Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20, subd. 1(a).

Minn. Stat. § 549.20, subd. 1(b) states that:

> A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Thus, at the amendment stage, the supporting affidavits provided by the plaintiff must present a prima facie showing of clear and convincing evidence that the acts of the defendant exhibit a deliberate disregard for the rights or safety of others. Olson v. Snap Products, Inc., 29

F. Supp. 2d 1027, 1037 (D.Minn. 1998) citing Swanlund v. Shimano Ind. Corp., Ltd., 459 N.W.2d 151, 154 (Minn. Ct. App. 1990). Prima facie evidence is "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." Black's Law Dictionary 579 (7th ed. 1999); McKenzie v. Northern States Power Co., 440 N.W.2d 183, 184 (Minn. Ct. App. 1989) ("prima facie evidence is that evidence which, if unrebutted, would support a judgment in that party's favor"). Under the prima facie standard, "the Court makes no credibility rulings, nor does the Court consider any challenge, by cross-examination or otherwise, to the Plaintiff's proof." Ulrich, 848 F. Supp. at 867. Further, the motion should be thoroughly examined, "without considering evidence submitted in opposition." Northwest Airlines, Inc. v. American Airlines, Inc., 870 F. Supp. 1499, 1503 (D. Minn. 1994) citing Swanlund 459 N.W.2d at 154.

"Where the evidence is sufficient to permit the Jury to conclude that it is 'highly probable' that the defendant acted with deliberate disregard to the rights or safety of others, the 'clear and convincing' standard would be satisfied." Ulrich, 848 F. Supp. at 868.

When a plaintiff moves to add a punitive damage claim, the Court is essentially required "to direct a portion of the verdict against the plaintiff if the evidence of [deliberate disregard] is insufficient." Swanlund, 459 N.W.2d at 155. Thus, as in ruling on a motion for directed verdict,[3] the Court must view the evidence most favorably to the party against whom the motion is made, and give that party the benefit of all reasonable inferences from the evidence. See Abbett v. County of St. Louis, 474 N.W.2d 431, 433 (Minn. Ct. App. 1991).

---

[3] Now denominated in the Federal Rules of Civil Procedure as a motion for the entry of judgment as a matter of law. See Fed. R. Civ. P. 50(a).

**C. Discussion**

Plaintiff seeks to add a claim for punitive damages against Defendant Green.[4] Plaintiff states that any reasonable person would have known that sending out this witness statement would endanger Gatlin. Plaintiff observes that both Kittleson and Ashpole were concerned not to release the letter. Moreover, Carlson and Lenzen made numerous significant attempts to contact Gatlin after they learned the letter was sent out. Hence, a police officer who worked in murder investigation, such as Defendant, should certainly have understood the danger. Nevertheless, Plaintiff states, Defendant had the letter sent out before receiving instructions from McGlennen.

In addition, Plaintiff states that Defendant never inquired into the jail subpoena process or any postal regulations to determine if it would have been possible to further delay releasing the letter. Defendant also never discussed what process should have been followed with his division commander or any other higher ranking personnel. Plaintiff states that Defendant worsened matters by failing to notify Gatlin that the transcript had been sent out until almost three weeks later. At this point, Gatlin was already in danger and was aware of the situation.

Plaintiff notes that the Minneapolis Police Department's Code of Conduct, Section 5-104 mandates that on-duty officers "at all times, take appropriate action within their jurisdiction, to protect life." In addition, Defendant was aware from the initial interview that Gatlin had a wife and children. Plaintiff states, therefore, that Defendant acted in deliberate disregard for Gatlin's safety. Accordingly, Plaintiff concludes that the Complaint should be amended to include a

[4]Plaintiff also seeks to add a claim for exemplary damages under Minnesota's Government Data Practices Act. Defendant makes no objection to Plaintiff's motion in this respect, conceding that Plaintiff has a right to include that claim at this point. Consequently, the Court grants Plaintiff's motion with respect to exemplary damages under Minnesota's Government Data Practices Act.

claim for punitive damages.

Defendant responds that he should not be subjected to a claim for punitive damages. He states that he took "timely and appropriate action to alleviate any potential for harm that resulted from Gatlin's statement being mailed from the jail." He explains that his actions, when viewed in total, do not amount to a reckless disregard for Gatlin's rights.

Defendant states that the law concerning the jail's mail policy is unclear, and he questions his right or ability to have stopped the letter from being sent. In addition, he argues that he never made any promises of protection to Gatlin. Instead, he informed Gatlin that he would have to request protection directly from the County Attorney. Nevertheless, Defendant notes, Gatlin chose to offer the information and put himself in danger by later testifying. Despite making no promises of protection, Defendant emphasizes that he still informed Gatlin that the letter had been sent, and attempted to help him by bringing him to a witness advocate after he appeared before Judge Oleisky.

The Court grants Plaintiff's motion. Plaintiff has complied with the pleading requirements of Minn. Stat. § 549.191, by correctly seeking leave of the Court to amend the complaint and add a punitive damages claim, rather than alleging it in the first instance. Further, the Court finds that Plaintiff has made a prima facie case of clear and convincing evidence that Defendant acted with deliberate disregard for Gatlin's safety. Defendant was present during the interview with Gatlin, and knew that his statements, if disclosed, would likely place him in serious danger. Yet he authorized sending Hurd's letter, and took no efforts to inform Gatlin or help him until almost three weeks later.

Defendant's arguments concerning the Carver County Jail's mail policy are unpersuasive.

Both times Ashpole spoke with Green, he asked Green if he wished to subpoena the letter. Hence, Green was aware from the beginning that there was a procedure for at least delaying the delivery. While Green suggests that he did not know all of what he could do under that procedure, there is no indication that he seriously attempted to find out. Green's own statements illustrate this point well. In the July 9, 1998 Case Supplement, Green stated that "[a]t the time I spoke with Sgt. Ashpole I was unaware of anything prohibiting the sending of this mail." And in his deposition, Green stated "if it was against the policies and guidelines of the Carver County Sheriff's Department as set up by the sheriff, to not send it; but if it didn't fit the criteria for things that couldn't be sent, I didn't know how it could be stop[ped]."

Green's first statement suggests that he would only stop the mailing if the policy in place actually required that. He does inquire into whether the policy allows for detaining the mail, or if there are any alternative measures that could be taken. Yet he was being asked to decide whether to authorize placing Gatlin in grave danger. Green's second statement that he did not know how the mailing could be stopped, implies a similar approach. It ignores the question of why he made no effort to find out.

The Court also can not accept Defendant's statement that it was only through a later conversation with McGlennen that he "learned that the sending of this mail would be detrimental to the safety of Juwan Gatlin." As stated above, Green knew the information contained in the interview transcript. He also knew who Hurd was, and must have understood the implications of his note that "something needs to be done about this." Therefore, Green was surely aware of the danger before ever speaking with McGlennen.

Combining Green's delay in notifying Gatlin with the above facts leads the Court to

conclude that he acted with deliberate disregard for Gatlin's safety. Green chose to allow Gatlin to be placed in great danger, and then exacerbated the situation by failing to notify him for a significant amount of time. Even if the Court were to accept that Green only appreciated the danger after speaking with McGlennen, he still delayed notifying Gatlin until July 9, when he appeared in court. This behavior is in sharp contrast to Carlson and Lenzen, who took immediate measures to inform Gatlin of the situation and determine what could be done to alleviate at least some of the danger. Hence, Defendant's argument concerning when he became aware of the danger still fails to justify his subsequent behavior.

Finally, the Court is unpersuaded by Defendant's point that he had made no promises to Gatlin. Whether or not Defendant was obligated to Gatlin by an agreement, he still was aware of the potential danger, and passed up multiple opportunities to reduce it. Thus, Plaintiff has produced evidence demonstrating that Defendant had knowledge of facts creating a high probability of injury to Gatlin's safety, and still proceeded to act with indifference to that danger. Plaintiff is, therefore, entitled to amend the Complaint and include a claim for punitive damages.

**THEREFORE, IT IS HEREBY ORDERED that:**

Plaintiffs' Motion to Amend Complaint to Include Claim for Punitive Damages (Doc. No. 12) is **GRANTED.**

Dated: July 1, 2002

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge