UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
02-CV-154(JMR/SRN)

| | | |
|---|---|---|
| Demetrius Gatlin, as Trustee for the Estate of Juwan Gatlin | ) | |
| v. | ) | ORDER |
| Sergeant Michael Green, individually and in his official capacity as a Minneapolis Police Officer; and the City of Minneapolis, a municipal corporation | ) | |

I. Introduction

Juwan Gatlin, a Minneapolis resident, cooperated with law enforcement authorities, giving them information about unsolved crimes, including Anthony Dawson's murder, committed by members of the Mickey Cobra street gang. On August 7, 1998, Juwan Gatlin was murdered.

Demetrius Gatlin, Juwan Gatlin's widow and trustee, filed this lawsuit against Minneapolis Police Sergeant Michael Green and the City of Minneapolis, alleging violations of state and federal law. She claims the defendants engaged in wrongful conduct, which led to Juwan Gatlin's death.

Defendants seek summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). For the reasons set forth below, defendants' motion is granted.

FILED
RICHARD D. SLETTEN, CLERK
SEP 27 2002
JUDGEMENT ENTERED SEP 27 2002
DEPUTY CLERK'S INITIALS ______

## II. Background

### A. The Dawson Murder

The Court, having considered defendants' motion for summary judgment in the light most favorable to plaintiff, finds the record supports the following facts.

On May 29, 1997, more than a year before Juwan Gatlin's death, Anthony Dawson, a member of the Gangster Disciples street gang, was murdered.[1] Early police investigation led to the arrest and charge of two individuals identified by eyewitnesses.[2]

In June, 1997, while in custody on unrelated aggravated robbery charges, Mr. Gatlin contacted the police and told them he had information about the Dawson murder.[3] Gatlin told police he wanted to provide information, but he didn't "want to put mine [sic] out there without, you know, I'm down here on some garbage." [Pl. Ex. 12 at 3]. He told the police, and his attorney at the time,[4] that he wanted a deal on his robbery charge in exchange for

---

[1]Mr. Dawson was shot and killed during a Mickey Cobra gang raid on a North Minneapolis "weed house."

[2]Police officers originally arrested Eric West and Vontrel Williams. Following Mr. Gatlin's statement they were released.

[3]That same day, Dawson's sister, Brenda, arranged a conference call telling police that Mr. Gatlin had information related to the murder.

[4]At this time, Mr. Gatlin was represented by Evan Rosen, an assistant Hennepin County Public Defender. (Gatlin later requested new counsel, and ultimately chose to proceed pro se.) While acting as Gatlin's attorney, Evan Rosen warned him he did not believe the police could protect him, and that he faced a serious danger of gang retaliation.

the information.

On June 22, 1997, Gatlin gave the Minneapolis police officers a recorded statement while at the Hennepin County Jail. He told Sergeants Green and Carlson that Mickey Cobra gang members Arthur K. Hurd and Mitchell Lamont Douglas committed the Dawson murder.[5] Gatlin gave detailed information about the killing and the location of key physical evidence, including the murder weapon and clothing worn by the shooters. He also provided information about other unsolved gang-related crimes, and detailed the organization and structure of the Mickey Cobra street gang.

Gatlin understood the implications of his statement. He told the officers that after 25 years as a Mickey Cobra he intended to leave the gang lifestyle behind. He said he was willing to wear a wire, or to testify, but would need help leaving the Twin Cities to protect his safety. The officers told Gatlin they could not negotiate a deal, but that they would speak with the Hennepin County Attorney. Some time later, Gatlin was released from custody and absconded. He was subsequently apprehended and incarcerated until the disposition of his robbery case.

On March 17, 1998, Gatlin testified before the Hennepin County Grand Jury concerning the Dawson murder. On April 15, 1998, Arthur Hurd was arrested, indicted on charges of First Degree Murder, and

---

[5]Both men later pleaded guilty to the murder.

detained in the Carver County Jail.

On May 20, 1998, Gatlin was sentenced in Hennepin County District Court for armed robbery.[6] The Court stayed his 150 month presumptive sentence, and gave him 3 years probation in recognition of his assistance in the Dawson case. As a condition of probation, the Court ordered him to remain in contact with the prosecutor and police officers, and to provide testimony when summoned.

Gatlin had no contact with Sergeant Green between June 22, 1997, and his sentencing on May 20, 1998.[7] Instead, he communicated with Sergeant Carlson and Officer Mark Lenzen, who were assigned to the Dawson murder case. Members of the police force, including Sergeants Carlson and Lenzen, met with Gatlin seven and ten times during this period.

B. <u>The Hurd Letter</u>

Everyone involved in this case knew that at some time Mr. Gatlin's participation would become public. [Gatlin Sentencing Tr. at 6:7-11 (April 20, 1998).]

On or about June 20, 1998, as part of Carver County Jail's routine inmate-mail inspection, Officer Eric Kittleson reviewed a

---

[6]He pleaded guilty to the robbery on March 18, 1998. At the hearing, both Assistant Hennepin County Attorney McGlennen and Judge Allen Oleisky expressed concern about his safety.

[7]According to Officer Green, after the Dawson murder investigation went to the Hennepin County Attorney's office, he was no longer involved in the case. [Green Depo. at 22, line 4-10; p. 23, line 2-6].

letter written by Arthur Hurd. The letter was directed to fellow Mickey Cobra gang member Andrew Neal, and included a transcript of Gatlin's statement in the Dawson murder and a handwritten note which said: "Check this out. Something must be done about this." There is no substantial dispute that this was a reference to Gatlin.[8]

Officer Kittleson kept the letter, and on June 21, 1998, he contacted his superior officer, Sergeant Reed Ashpole. Ashpole, being concerned with gang retaliation, called Sergeant Green to ask what he should do. [Pl. Ex. 3]. Green stated he would subpoena the letter. The Carver County authorities then photocopied Hurd's handwritten note. This copy of the Hurd letter, for reasons unknown to the Court, no longer exists.

After Ashpole's call, Sergeant Green attempted to contact Assistant Hennepin County Attorney Gary McGlennen, because he felt McGlennen would best understand the legally appropriate response to the letter. Green did not reach him, but left a voicemail message, which also no longer exists.

By June 23, 1998 -- two days after Ashpole's call -- Green had still not heard from Mr. McGlennen. Ashpole then contacted Green again and asked what should be done with the letter.

---

[8]The parties agree Hurd probably received Gatlin's statement from his lawyer, who received it in pre-trial discovery. There is no claim that either Sergeant Green, or any other member of the Minneapolis police force, provided the transcript.

According to Ashpole, Green declined to subpoena or get copies of the letter, and told Ashpole to mail the letter to its intended recipient. Ashpole relayed this information to Kittleson, and the letter was mailed to Andrew Neal. In a case supplement memorandum filed by Sergeant Green on July 9, 1998 [Pl. Ex. 6], he stated he "was unaware of anything prohibiting the sending of this mail," and until he spoke with McGlennen, did not realize "the sending of this mail would be detrimental to the safety of Juwan Gatlin."

Once Minneapolis police learned Hurd's letter had been mailed, they attempted to warn Gatlin of his possibly heightened exposure to danger. Sergeant Carlson, one of the Dawson case investigators, phoned Gatlin on July 8, 1998, to warned him about the letter and its contents, and to let him know officers planned to discuss the letter with Andrew Neal. During the call, Gatlin told Officer Carlson he already knew of the mailing because he had spoken with Andrew Neal.[9] Gatlin further told Sergeant Carlson that Hurd had little influence in the gang, and that the letter was not a concern to him. He described Neal as a lifelong friend, and stated that, while Neal was still considering "putting out" the letter, he thought it unlikely. Gatlin said he believed if the letter was put out, fellow Mickey Cobra gang members would try to kill him.

[9]Neal gave a statement to Minneapolis homicide officers on September 6, 1998. [Pl. Ex. 7]. Neal acknowledged learning about Gatlin's statement prior to receiving the letter. He told the officers that Hurd had told him about it during a phone call from the Carver County Jail.

Gatlin reminded police he was fearful for his and his family's safety.

On July 9, 1998, officers brought Gatlin to the Minneapolis homicide unit. Thereafter, County Attorney McGlennen brought a motion asking the Court to alter Gatlin's terms of probation. The Court did so, authorizing Gatlin to absent himself from Minnesota until his testimony was needed.[10] It was agreed Gatlin would leave for Arkansas, where his wife had family.

McGlennen also called Gatlin to warn him of the immediate danger posed by Hurd's letter, and arranged to fund Gatlin's transportation to Arkansas through his office's Victim/Witness Protection program. On July 10, 1998, Carlson and Lenzen gave Gatlin $350.00 from the Police Chief's Contingency Fund to cover hotel expenses for the coming weekend. Gatlin agreed to spend the weekend in Hudson, Wisconsin, to avoid an encounter with Mickey Cobra gang members.

The following Monday, July 13, 1998, witness advocate Mykelene Cook met with Gatlin and gave him a check for an additional $450.00 to cover travel expenses to Arkansas. She agreed to give him additional funds if needed for his first month's rent and damage

---

[10]The Court asked whether Mr. Gatlin should be transferred under the Interstate Compact for Adult Supervision. The parties did not believe this type of transfer was needed.

deposit.[11] Gatlin then asked for a moving trailer, and Cook agreed to pay this expense. She gave him the money at the local U-Haul store on July 14, 1998. While there, Gatlin asked her to pay for an auto tune-up instead of the trailer rental, and she gave him a check for this purpose. Gatlin cashed all of these relocation checks. Both Cook and the police officers believe he left the state following these arrangements.

C. The Gatlin Murder

Juwan Gatlin was shot between 13 and 15 times with a .40 caliber Smith and Wesson handgun in an alley near Logan Avenue in Minneapolis at approximately 11:00 a.m. on August 7, 1998. The gun has never been found. His death occurred a month after he met with Minneapolis police officers to discuss the Hurd letter, and more than three weeks after his meeting with Ms. Cook.

Police investigators determined the murder occurred shortly before the body was found. The investigating officers interviewed Andrew Neal, who admitted receiving the Hurd letter. Neal said he told at least one other Mickey Cobra gang member -- Donald Carter -- about its contents.[12] Police ultimately identified three people

[11]Plaintiff claims Gatlin was promised reimbursement for the family's moving expenses, their first six months rent, transportation costs, and other bills incurred in the wake of the move. Ms. Cook said the Minneapolis Special Witness Assistance Program policy covers only the first month's rent and a damage deposit.

[12]Members of the Mickey Cobras referred to Carter as the "don of dons" -- the organization's leader. The gang's rules make clear that giving information to police about a fellow member is a gang betrayal and justifies a hit.

as suspects in Mr. Gatlin's murder. One suspect was killed in an unrelated incident in Chicago before he could be arrested; one pleaded guilty; and the remaining individual was convicted following a jury trial.

On December 29, 2000, Demetrius Gatlin filed this suit in Hennepin County District Court. Defendants timely removed the matter to federal court, pursuant to 28 U.S.C. §§ 1441(a) and (b), invoking this Court's original jurisdiction over plaintiff's federal civil rights claims. Defendants subsequently moved for summary judgment.

III. Legal Standard

Summary judgment is appropriate when there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Anderson, at 248-49; see also Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Liberty Lobby, Inc., 477 U.S. at 247-48. If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the

burden of proof at trial, summary judgment should be granted. See Celotex, 477 U.S. at 322.

IV. Plaintiff's Federal Claims

Plaintiff claims deprivation of federal constitutional and civil rights under 42 U.S.C. § 1983; denial of Fourteenth Amendment equal protection, pursuant to 42 U.S.C. § 1981; and failure to prevent wrongs, in violation of 42 U.S.C. § 1986. She claims the defendants were the direct and proximate cause of Mr. Gatlin's death.

A. Qualified Immunity Claims Against Sergeant Green

Plaintiff brings two claims against Sergeant Green in both his individual and official capacity. Before reaching the substance of these claims, the Court must first consider whether Green is susceptible to liability on these facts.

"Section 1983 affords redress against a person who, under color of state law, deprives another person of any federal constitutional or statutory rights." See Omni Behavior Health v. Miller, 285 F.3d 646, 650-51 (8th Cir. 2002) (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985)). Federal civil rights law is well-settled: qualified immunity protects state and local police officers from liability for discretionary acts where three requirements are satisfied. See id. at 651; Anderson v. Creighton, 483 U.S. 635, 638-39 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1981).

> To withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1)

> assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated plaintiff's clearly established rights.

Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996).

1. Constitutional Injury

A plaintiff must allege a constitutional injury in order to maintain a federal claim. See Rowe v. Lamb, 130 F.3d 812, 814 (8th Cir. 1997). Plaintiff complains of deprivation of equal protection and due process.

a. Equal Protection

Count Seven of the complaint alleges deprivation of Equal Protection, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. Plaintiff claims Sergeant Green unlawfully considered Gatlin's race in investigating the decedent's case, thereby infringing his rights. She further argues Sergeant Green considered race when authorizing the mailing of the Hurd letter, thereby affirmatively placing Gatlin in danger. Plaintiff next claims Green's failure to warn Gatlin of the danger created by the mailing evidences racial animus. Neither assertion rises to a violation of a constitutionally protected right.

Plaintiff premises her claims on a comparison of the protection afforded witnesses in another case. That other case concerned the investigation and prosecution of the assassination-style murder of Minneapolis Police Officer Jerome Haaf ("Haaf case") by members of the Conservative Vice Lords ("Vice Lords"),

another urban gang.[13] Sergeant Green was deeply involved in the Haaf investigation, unlike his tangential involvement in the Dawson murder investigation.

By way of background, Ed Harris, a key witness in the Haaf case, was murdered by Vice Lord gang members for his suspected cooperation with the police. Thereafter, perceiving heightened danger to the remaining witnesses, Sergeant Green was assigned primary responsibility for witness protection and relocation duties. While performing these duties, he gave Harris's widow[14] a monthly stipend, rent payments, apartment furnishings, personal goods, and transportation. She was also funded for at least four relocations over a 37 month period, and when she appeared for testimony, the City provided round-the-clock protection, along with food and clothing. Green arranged less comprehensive protection for eleven other key witnesses and their families. These costs were borne by the Chief's Contingency Fund, the Hennepin County Attorney's Office, and the Minnesota Bureau of Criminal Apprehension. The Court finds these facts do not present a triable issue of racial animus on Sergeant Green's part.

---

[13]The Haaf investigation is extensively detailed in State of Minnesota v. Willis, 559 N.W.2d 693 (Minn. 1997) (upholding murder convictions in Haaf case); State of Minnesota v. Ford, 539 N.W.2d 214 (Minn. 1995) (same); State of Minnesota v. Flourney, 535 N.W.2d 354 (Minn. 1995) (upholding murder convictions in Harris case); State of Minnesota v. McKenzie, 532 N.W.2d 210 (Minn. 1995) (Haaf case); State of Minnesota v. Bowles, 530 N.W.2d 521 (Minn. 1995) (Haaf case).

[14]Mrs. Loverene Harris testified in at least seven trials following the Haaf murder.

The Court finds, as a matter of law, that the mere fact that differing security steps were taken in the Haaf case is not evidence that Sergeant Green's actions in this case were motivated by racial animus, or that he took race into account in the events leading to the release of the Hurd letter or in attempting to warn and protect Mr. Gatlin. See Omni, 285 F.3d at 655 (dismissing a § 1983 equal protection claim that is an "unsupported and conclusory allegation"); see also Wayte v. United States, 470 U.S. 598 (1985) (finding claims of selective law enforcement must show deliberate, intentional, or purposeful discrimination).

The Court does not question that differing treatment was afforded the Haaf witnesses from that given to Gatlin in the Dawson case. But this differing treatment does not show racial animus, because the witnesses were not at all similarly situated. Plaintiff's assertions entirely fail to consider that the heightened protection plaintiff here claims was due him was not imposed in the Haaf case until after Mr. Harris was murdered. The fact that after the murder of an African-American cooperating witness the police racheted-up security for the surviving witnesses cannot be considered evidence of animus in this decidedly different situation.

Plaintiff suggests that the Haaf witnesses were better protected because Officer Haaf, the murder victim, was Caucasian, and Mr. Dawson was African-American. The suggestion does not withstand scrutiny. Other than the clear fact of the differing

races of the respective murder victims, there is no evidence whatsoever that race motivated levels of protection. The fact that -- in the Haaf case -- a cooperating witnesses was murdered prior to the extraordinary efforts to shield the remaining witnesses creates a reasonable, race neutral, explanation for differing levels of security. Beyond mere conjecture, there is no record evidence justifying a jury trial on the issue of Sergeant Green's efforts at witness protection or relocation.

Plaintiff's evidence also fails to demonstrate that racial animus motivated Sergeant Green's actions concerning the release of the Hurd letter. There is no showing whatsoever that Sergeant Green handled any other mail or documentation differently because of the race of its subject. Plaintiff cites no acts or statements indicating race played any part in mailing the letter; summary judgment on these claims is therefore appropriate.

b. Due Process

In Count Six, plaintiff alleges violation of Mr. Gatlin's constitutional and civil rights. The complaint, however, is silent on which particular constitutional right may have been violated. Given the specific Equal Protection claims in other counts, it appears this claim alleges a deprivation of substantive due process. Even construed in this light, Count Six claims only a generalized deprivation of freedom from bodily injury or restraint and the protections of life. Thus, Count Six simply fails to state a cognizable claim.

In order to establish a violation of Due Process, a plaintiff must identify the allegedly-protected liberty or property interest which was denied. See id. at 651. As the Supreme Court has stated, "the Due Process clause is violated by executive action only when the [action] 'can be properly characterized as arbitrary, or conscious shocking, in a constitutional sense.'" County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) (quoting Collins v. City of Harker Heights, 503 U.S. 115 (1992)). A mere statement claiming a party was deprived of a liberty interest by failure to take actions necessary to protect is insufficient.

Plaintiff has not pleaded a constitutionally cognizable injury, because she has not shown egregious conduct of the type needed to support her claim:

> We have . . . rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of the state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of action most likely to rise to the conscious-shocking level.

Lewis, 523 U.S. at 848-49, quoted in Omni, 285 F.3d at 651-52.

It clearly would have been better if Sergeant Green had advised Sergeant Ashpole to retain the Hurd letter. But while his failure to do so may have been negligent, mere negligence is insufficient to establish a constitutional deprivation. See id. Undisputably, however, once the letter was out, and Mr. Gatlin was

warned of the possible danger he faced, he did not leave Minnesota. Any dispute over how much money he received or whether he should have received more is a cavil. He received funds and was given the wherewithal to leave Minnesota. A court afforded him the extraordinary ability to leave the state while on probation. Simply put, he declined to do so. When seen in this light, the harm that befell him cannot be viewed as the result of the defendants' intentionally tortious acts. Sergeant Green's efforts to protect Mr. Gatlin cannot be considered arbitrary or capricious in any sense; as a result, plaintiff has failed to plead a viable Due Process claim.

While the complaint takes as a given that the Hurd letter caused Mr. Gatlin's death, there is no real evidence that this is so. Hurd lawfully knew of Gatlin's statements to the police. He may have spoken to someone, who either took a message to another, or who may have taken retributive steps without ever seeing the letter. There is no evidence, other than its mere existence, that the letter actually caused Gatlin's death; conjecture alone connects the letter to the murder.

However broadly this Court might interpret the complaint, no specific constitutional violation is alleged. Having taken into account the liberal pleading rules, the Court finds no specific constitutional injury. Absent a constitutional injury, the claim fails.

2. Clearly Established Right

After showing injury to a constitutional right, plaintiff must also prove the right was clearly established at the time of the violation. See Greer v. Shoop, 141 F.3d 824, 827 (8th Cir. 1998). To satisfy this burden,

> the contours of the right must be sufficiently clear that a reasonable official would understand that what he [wa]s doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must [have been] apparent.

See Anderson, 483 U.S. at 640. There must be a "requisite degree of factual correspondence between the case at issue and [any] previous cases" in order to demonstrate a clearly established right. See Omni, 285 F.3d at 653 (quoting Lappe v. Loeffelholz, 815 F.2d 1173, 1177 (8th Cir. 1987)).

Plaintiff cites no Minnesota or Eighth Circuit cases that require police or jail guards to embargo and detain threatening prison mail. The most analogous case is United States v. Kelton, 791 F.2d 101 (8th Cir. 1986), authorizing prison officials to read and copy incriminating outgoing prisoner mail before posting it. Neither Kelton nor any case known to the Court establishes an affirmative duty to halt the mailing of threatening letters.

No case prescribes protection of confidential informants from retaliatory violence. The Due Process Clause certainly "forbids the state itself to deprive individuals of life, liberty or property without 'due process of law,' . . . [but] its language

cannot fairly be extended to impose an affirmative obligation on the state to insure that those interests do not come to harm through other means." DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 195 (1989) quoted in Gregory v. City of Rogers, 974 F.2d 1006, 1009 (8th Cir. 1992). While the constitution's protection of life against government action is well-established, there is no similar protection from third-party conduct. See id.; Ying Jing Gan v. City of New York, 996 F.2d 522, 533-34 (2d Cir. 1993) (rejecting claims against prosecutors for failure to protect witnesses from third-party attack). There is no explicitly recognized right to security from violence for confidential police informants.

Next, plaintiff argues Mr. Gatlin's rights were clearly established under one of two exceptions to the DeShaney rule: state created danger and special relationship.

a. State Created Danger

Plaintiff claims Sergeant Green's failure to retain the Hurd letter created danger to Gatlin, thereby stripping him of any qualified immunity protection. The Eighth Circuit Court of Appeals recognized a state-created danger exception to qualified immunity in Wells v. Walker, 852 F.2d 268 (8th Cir. 1988). Wells acknowledged a possible deprivation of due process rights when "the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in," absent state conduct. See id. at 370; Carlton v. Cleburne County, 93 F.3d

505, 508 (8th Cir. 1996) (stating that to establish liability, plaintiff must show he "would not have been in harm's way but for the government's actions"). Whether a relationship triggers a special duty is a question of law. See Ying Jing Gan, 996 F.2d at 534.

Plaintiff relies heavily on Monfils v. Taylor, 165 F.3d 511 (7th Cir. 1998) in arguing this case falls within the ambit of state-created danger. Monfils involved the murder of a police informant. Id. at 513. Monfils telephoned police to warn them about a co-worker's plans to steal company property. Id. Because the co-worker had a history of violent behavior, Monfils insisted his identity remain confidential. Id. at 513-15. In spite of several promises of anonymity, Monfils' taped call was released to the co-worker, who murdered him shortly thereafter. Id. The Seventh Circuit Court of Appeals found the officers' repeated assurances, coupled with their affirmative act in releasing the tape -- in contravention of their assurances -- resulted in a state-created danger. Id. at 518-20.

Here, the flaw in plaintiff's argument is in the very terms used by the Eighth Circuit to define state-created danger: to invoke a claim of state created danger, the danger must -- at a minimum -- be exacerbated by state action. See Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir. 1990) ("the overall danger must at least be greater than it would be absent state danger"). In Monfils, the police officers' assurances of safety, and their

affirmative act of releasing the statement in spite thereof, plainly heightened the danger by actively giving the would-be murderer his accuser's identity. These are not the facts here.

Sergeant Green did not give Hurd Gatlin's identity; Hurd obtained that information from his attorney. Nor did the letter put word of Gatlin's involvement as an informant on the street. Hurd could, and did, disseminate the information by multiple means. When interviewed by police, Neal said he learned of Gatlin's statement during a telephone call prior to receiving the letter. Sergeant Green may not have helped the circumstance, but no reasonable trier of fact could find Green's authorization of the mailing caused Gatlin's death. This is particularly true here, where Gatlin deferred departing Minnesota for almost a month after he knew the information was public.

In this case, unlike Monfils, it was always clear Gatlin's information would become public. In Monfils, the officers repeatedly assured the informant he would remain anonymous and that his safety would be protected. Gatlin knew his information would be used and given to Mr. Dawson's killers, and that at some point, his identity and cooperation would become public knowledge. Sergeant Green, therefore, cannot be deemed to have created any danger to Mr. Gatlin.

b. Special Relationship

Alternatively, plaintiff claims a special relationship existed between Gatlin and defendants, creating liability. It is

her claim that the informant-police officer relationship gives rise to a special duty to protect the informant from third-party harm. See G-69 v. Degnan, 745 F. Supp. 254, 263-265 (D.N.J. 1990) (where a court found a special relationship when an informant was induced to act as an undercover agent for purposes of injunctive relief, but found no clearly established right supporting damages); see also DeShaney, 489 U.S. 189 (1989) (mentioning notion of special relationship in dicta); Greer v. Shoop, 141 F.3d 824, 827 (8th Cir. 1998) (applying special relationship theory in case involving spread of HIV by diagnosed parolee).

While the Eighth Circuit has not considered this theory, vis-a-vis police-informant relationships, the Sixth Circuit Court of Appeals has done so. See Summar v. Bennett, 157 F.3d 1054 (6th Cir. 1998). The Sixth Circuit's analysis is compelling. In Summar, the Court analyzed cases interpreting DeShaney and found a special relationship always involved a state-created danger. See id. at 1058 (citations omitted); see also Greer, 141 F.3d at 827 (linking special relationship to state action). The Sixth Circuit's analysis is consistent with Eighth Circuit cases where the concept of special relationships is "not intended to extend beyond prison or prison-like environments," Harpole v. Arkansas Dep't of Human Servs., 820 F.2d 923, 924 (8th Cir. 1987), or other custodial situations, Burton v. Richmond, 276 F.3d 973, 979 (8th Cir. 2002) (citations omitted) (applying exception to suit involving improper administration of foster care).

As here, the decedent in Summar volunteered to serve as a confidential informant, hoping to improve his situation with respect to other pending charges. See id. at 1059. This made the "transaction" voluntary. As such, it "did not impose any constraint on his freedom to act." See id. at 1059. The Sixth Circuit found the relationship to be outside the exception created in DeShaney. See id.

Gatlin initiated the informant/police relationship, intending to improve his own custodial situation. He hoped for a favorable outcome to his pending armed robbery charges. He was never in Sergeant Green's custody. In the absence of any type of custodial relationship between Gatlin and Sergeant Green, and recognizing the extensive efforts to assist Gatlin in his legal predicament, it is clear no special relationship existed.

3. Reasonableness of Green's Actions

The final question used in evaluating questions of qualified immunity is whether the officer should have known his conduct violated clearly established rights. Omni, 285 F.3d at 654. The "linchpin of qualified immunity is the objective reasonableness of the officer's actions." Wilson v. Spain, 209 F.3d 713, 716 (8th Cir. 2000). The reasonableness of police action is a question of law. See Corren v. Hanson, 880 F.2d 95, 97 (8th Cir. 1989). The Court finds Sergeant Green's actions, considered in light of the information he possessed, were objectively reasonable.

When called about the Hurd letter, Sergeant Green attempted to

contact Hennepin County Attorney McGlennen to determine whether release of the letter was legally appropriate. When his effort was unsuccessful, he authorized its release. Thereafter, Minneapolis police and the county agents repeatedly warned Gatlin and urged him to leave the jurisdiction, giving him funds to finance his departure; the Constitution does not require more. Gatlin, according to his own statements, knew word of his cooperation was out even before the letter was circulated. There is no clearly established constitutional principle under which Sergeant Green or the other defendants can be made to protect a person who will not comply with their protective efforts. Under these circumstances, the defendants' actions were objectively reasonable as a matter of law.

B. Claims Against the City of Minneapolis

In addition to the claims against Sergeant Green, plaintiff alleges several rights violations by the City of Minneapolis. She asserts violations of 42 U.S.C. § 1983 -- failure to properly train and supervise, and a policy and custom of discriminatory practices by the Minneapolis Police Department, and 42 U.S.C. § 1986 -- failure to prevent wrongs.

The United States Supreme Court, in Monell v. New York City Department of Social Services, held that § 1983 does not subject a municipality to liability for employee wrongdoing under a theory of respondeat superior. 436 U.S. 658, 694 (1978). A municipality's liability is limited to cases of affirmative municipal wrongdoing,

id. at 690, or illegal action pursuant to a policy, practice or custom, see Young v. Harrison, 284 F.3d 863, 869 (8th Cir. 2002) (citations omitted). "There must exist a prior pattern of unconstitutional conduct that is so 'persistent and widespread' as to have the effect and force of law." See Andrews v. Fowler, 98 F.3d 1069, 1075 (8th Cir. 1996) (quoting Monell, 436 U.S. at 691). Plaintiff argues the City is liable for its illegal customs and failure to properly train Sergeant Green.

1. Custom or Policy

The Supreme Court identified two requirements for liability based on custom: (1) the custom must be attributable to the municipality through actual or constructive knowledge, and (2) there must be a causal relationship between the custom and constitutional injury. See Monell, 436 U.S. 692-94. According to plaintiff, the City "encouraged and implicitly authorized a policy and custom of persistent and widespread discriminatory practices by the Minneapolis Police Department," thereby causing Gatlin's death.

This theory fails. Plaintiff has offered no evidence of racial and discriminatory practices within the Minneapolis Police Department. She has proffered testimony of former Minneapolis Police Chief Anthony Bouza to support her theory and claim of racial discrimination. Mr. Bouza's testimony relating to the Haaf case is described above. According to plaintiff, "[t]he telling point is that the Department made greater efforts to investigate the killing of a white police officer, and did not similarly

address the killing of a black gang member." [Pl. Mem. at 26.] For the reasons described above, this argument is without foundation.

The City engaged in the same efforts to solve both murders, and in both cases, made arrangements to protect witnesses from violence. There is no evidence that the City took any greater protective efforts in the Haaf case until after its key witness was killed by gang members. Thereafter, the main difference -- utterly ignored in plaintiff's brief -- is that the surviving Haaf witnesses accepted police help, using municipal funds to leave the jurisdiction.

Unlike the Haaf witnesses, Gatlin remained in the City. Although he accepted municipal funds with which to leave, they were clearly not used for that purpose. There is no evidence whatsoever showing he would have left had he been given larger sums, nor is there any indication that he desired a greater amount. The former police chief's statement shows neither a custom nor practice of discriminatory law enforcement or racially-biased investigations in the City's homicide department. Plaintiff has not established either a custom of discrimination, or a link between such a custom and Gatlin's death.[15]

2. Failure to Train

A city may be liable for deficient training when its policies

[15]Because plaintiff has not introduced evidence indicating a custom of discrimination existed, the Court need not address whether this custom is attributable to the City.

are inadequate, and where it can be shown to be deliberately indifferent to the rights of others in adopting those polices. See City of Canton v. Harris, 489 U.S. 378, 389 (1989) cited in Andrews, 98 F.3d at 1076. A city's failure to train must result in the plaintiff's injury. Id. To sustain such a claim, the plaintiff must prove:

> . . . that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

See City of Canton, 489 U.S. at 390.

Here, plaintiff claims the City's failure to train its homicide officers in either prisoner-rights law or regulation of jail correspondence supports this theory. The Court does not agree. It holds, instead, that as a matter of law, no reasonable jury could decide a lack of training in these areas resulted in Gatlin's death -- particularly given the Court's previous finding that Gatlin's constitutional rights were not violated.

Even if Gatlin's rights were somehow violated, liability would not attach here. Sergeant Green was a homicide detective; he was neither a jail administrator nor guard. He had no special duties regarding the inmates' custodial correspondence. Plaintiff's argument is tantamount to saying that all police officers must be trained to handle any possible legal situation -- even one well outside their normal range of duties. The law does not impose a duty on homicide detectives to be familiar with the legal

intricacies of prisoner rights and mail.

3. Failure to Prevent Wrongs

Count Nine of plaintiff's complaint claims the City failed to prevent wrongs, in violation of 42 U.S.C. § 1986. This claim is based on plaintiff's assertion that the City knew in advance of Sergeant Green's acts, that the acts were wrongful, and that the City had the power to prevent them and failed to do so. Section 1986, in relevant part, provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

42 U.S.C. § 1986.

Plaintiff has neither argued nor pled the elements necessary to sustain this claim against defendants' summary judgment motion. Specifically, plaintiff nowhere alleges a violation of any right protected by 42 U.S.C. § 1985 -- a prerequisite to liability. See Adams v. Boy Scouts of Am. - Chicksaw Council, 271 F.3d 769, 774 n.8 (8th Cir. 2001); Steel v. City of Bemidji, 257 F.3d 902, 906 (8th Cir. 2001); Lewellen v. Raff, 843 F.2d 1103, 1116 (8th Cir. 1988).

Section 1985 protects against conspiracies to interfere with civil rights. These include a duty to prevent an officer from performing duties, obstructing justice, and depriving persons of

rights or privileges either "on the highway or on the premises of another," in order to interfere with that person's equal protection, due process, or voting rights. See 42 U.S.C. § 1985. The complaint, however, does not allege or offer evidence to support the existence of any such conspiracy.

Plaintiff similarly fails to demonstrate a genuine issue of material fact concerning the City's knowledge of any conspiracy to violate Gatlin's rights. Section 1986 liability is contingent on proof of actual knowledge by a defendant of the wrongful conduct. See Brandon v. Lotter, 157 F.3d 537, 539 (8th Cir. 1998) (citing Owen v. City of Independence, 445 U.S. 622 (1980)). Plaintiff has entirely failed to show how -- if at all -- the City knew of Sergeant Green's allegedly wrongful conduct. Absent any indication of knowledge, no liability arises.

Finally, § 1986 claims require a conspiracy based on racial animus. See Adams, 271 F.3d at 777-78 (dismissing claims without proof of racial animus); see also Griffin v. Breckenridge, 403 U.S. 88 (1971) (requiring proof of animus to establish liability under 42 U.S.C. § 1985). As the Court has explained throughout this opinion, there is simply no record evidence showing that race-based animus motivated any of the defendants' decisions in either the Dawson or Gatlin case.

V. Plaintiff's State Law Claims

Plaintiff's negligence [Counts One and Two], breach of contract [Counts Three and Four], Minnesota Human Rights Act [Count

Five], Minnesota Data Practices Act [Counts Ten and Eleven], and placement in mortal danger [Counts Twelve and Thirteen] claims arise under state law, and are before this Court under its supplemental jurisdiction. 28 U.S.C. § 1367. The Court, having now dismissed the federal claims over which it has original jurisdiction, declines to exercise jurisdiction over the state claims. Accordingly, those claims are hereby remanded to Minnesota's courts.

IV. <u>Conclusion</u>

Juwan Gatlin's tragic death cannot be attributed to actions taken by Sergeant Green or the City of Minneapolis. Defendant's motion for summary judgment, insofar as it asserts federal claims against these defendants, fails. Summary judgment is granted on the complaint's federal claims in favor of the defendants. Accordingly, IT IS ORDERED that:

1. Defendants' motion for summary judgment [Docket No. 15] is granted.

2. Plaintiff's state law claims are hereby remanded to Minnesota's courts.

Dated: September 26th, 2002

JAMES M. ROSENBAUM
United States Chief District Judge